UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>**One silver Samsung Cell Phone**<br>**Model: SM-J327T1**<br>**IMEI: 355417/09/170673/6** | Case Number: **19MJ3911**<br>) AFFIDAVIT OF SPECIAL<br>) AGENT ENRIQUE MARTINEZ<br>) IN SUPPORT OF SEARCH<br>) WARRANT<br>) |

## AFFIDAVIT

I, Enrique Martinez, Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, having been duly sworn, depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant in furtherance of a narcotics smuggling investigation conducted by Special Agents of the Department of Homeland Security, Homeland Security Investigations, for the following target property: (1) one silver Samsung cellular telephone, Model SM-J327T1, IMEI Number 355417/09/170673/6 ("**Subject Telephone #1**") seized on June 16, 2019, from CONSTANCIO CORAL ("CORAL"), at the San Ysidro, CA Port of Entry.

2. **Subject Telephone #1** was seized from CORAL's vehicle when Customs and Border Protection Officers ("CBPOs") encountered CORAL at the San Ysidro, California Port of Entry on June 16, 2019. CORAL was the driver of a silver 2002 Mazda Tribute bearing California license plate number 4YDE642. CORAL was accompanied in the vehicle by his wife (Susana Coral), his adult daughter (Estefania Espinoza) and Espinoza's two minor children. Upon inspection of the vehicle,

1

CBPOs discovered 150 packages of methamphetamine, totaling approximately 50.14 kilograms (110.31 pounds), concealed in the fire wall, driver and passenger side rear door panels, rear quarter panels and spare tire of the vehicle. It is believed that **Subject Telephone #1** was used by CORAL to communicate with co-conspirators during the drug smuggling event. CORAL has been charged with importation of a controlled substance (methamphetamine) in the Southern District of California. Probable cause exists to believe that **Subject Telephone #1** contains evidence relating to violations of Title 21, United States Code Sections 952, 960 and 963. **Subject Telephone #1** is currently in an evidence vault located at 880 Front Street, San Diego, CA 92101.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe the items to be seized set forth in Attachment B (incorporated herein) will be found in the items to be searched as described in Attachment A (incorporated herein). These items may be or lead to: (1) evidence of the existence of drug trafficking in violation of Title 21, United States Code Sections 952, 960 and 963; and (2) property designed or intended for use, or which is or has been used as a means of committing criminal offenses. Because this affidavit is made for the limited purpose of obtaining a search warrant for **Subject Telephone #1**, it does not contain all the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

4. I am a law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal

Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

5. I am a Special Agent with Immigration and Customs Enforcement, Homeland Security Investigations (HSI), and have been so employed since June 2002. I am currently assigned to the Special Agent in Charge, San Diego Office, Asset Identification & Removal Group. My duties also include investigating the trafficking of illicit controlled substances, and the importation and distribution of illegal substances. I have training and experience in multiple investigative areas, to include conducting investigations and making arrests based on violations of Title 21 of the United States Code.

6. I have had approximately 17 weeks of intensive training at the Federal Law Enforcement Training Center at Glynco, Georgia. These 17 weeks included approximately 9 weeks of the basic criminal investigator training program and approximately 8 weeks of US Customs Special Agent Training. I have also received training in identifying various controlled substances and conducting Title 21 controlled substances investigations.

7. Prior to working for HSI, I worked for the US Customs Service as a Customs Inspector at San Ysidro, CA for approximately ten years. My duties as a Customs Inspector were to detect, deter, and defeat smuggling activities at the US/Mexico border.

8. I have personally participated in and conducted investigations of violations of various State and Federal criminal laws, including those related to narcotics violations. I have arrested or participated in the arrest of persons for violations of the Controlled Substances Act. In these cases, I have conducted interviews with the arrested persons and

their associates. I have conducted surveillance of narcotics smugglers as they conduct their smuggling activity while crossing the border from Mexico into the United States. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics smugglers, and the structure of their narcotics smuggling networks.

9. I have also spoken with other agents about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations. I have become familiar with the methods of operation typically used by narcotics traffickers. I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. Based on my training and experience, I have learned that load drivers smuggling controlled substances across the border are often in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances.

10. Moreover, I have learned that narcotics traffickers often require the use of one or more telephones to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and arranging for the disposition of proceeds from the sale of controlled substances. I have learned that professional narcotics operations depend upon maintaining extensive contacts. The use of telephones is essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers. The telephone enables narcotics dealers to maintain contact with narcotics associates, narcotics suppliers, and narcotics customers. I also have learned that narcotics

traffickers use multiple telephones to communicate with co-conspirators.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug smugglers will use cellular telephones because they are mobile, and they have instant access to telephone calls, text, web, and voice messages;

    b. Drug smugglers will use cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

    d. Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

    e. Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and

    f. The use of cellular telephones by smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

12. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the

facts and opinions set forth in this affidavit, I know that cellular telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within SIM cards, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular telephones yields evidence:

 a. tending to identify attempts to import methamphetamine or some other controlled substance from Mexico into the United States;

 b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers– used to facilitate the smuggling of methamphetamine or some other controlled substance from Mexico into the United States;

 c. tending to identify co-conspirators, criminal associates, or others involved in smuggling methamphetamine or some other controlled substance from Mexico into the United States;

 d. tending to identify travel to or presence at locations involved in the smuggling of methamphetamine or some other controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

 e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

 f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or

data involved in the activities described above.

13. Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all of the information known to federal agents regarding this investigation. Instead, it contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, upon conversations with other HSI Special Agents, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated.

## FACTS SUPPORTING PROBABLE CAUSE

14. On June 16, 2019, at approximately 7:50 p.m., CORAL applied for entry into the United States from Mexico at the San Ysidro Port of Entry, San Ysidro California. CORAL was the driver of a silver Mazda Tribute bearing California license plate, number 4YDE642 ("the vehicle"). CORAL was accompanied in the vehicle by his spouse (Susana Coral), his daughter (Estefania Espinoza), and Espinoza's two minor children. A CBPO was conducting pre-primary enforcement operations, observed his Narcotics/Human Smuggling canine alert to the vehicle, and requested assistance. CORAL and the occupants of the vehicle were escorted on foot by CBPOs to the secondary office. A CBPO received two negative declarations from CORAL. The vehicle was driven to the secondary lot. The CBPOs ran the vehicle through the Z-portal where anomalies were seen in the driver side rear door and quarter panels.

15. Subsequent inspection of the vehicle revealed 150 packages concealed within the vehicle. Randomly selected packages were field-tested, and tested positive for methamphetamine. The 150 packages collectively weighed approximately 50.14

kilograms (110.31 pounds).

16. CORAL was arrested for violating 21 U.S.C. §§ 952 and 960, Importation of Controlled Substances.

17. At the time of CORAL's arrest, CBPOs collected and seized **Subject Telephone #1** from the center console of the vehicle. I have reviewed the photographs CBPOs took of the vehicle's interior, and observed a silver cell phone in the center console of the vehicle that was connected to the vehicle via a gray cord. CORAL later indicated to agents that his cell phone was left in the vehicle in the center console, and was plugged into the vehicle's phone charger.

18. CORAL was read his *Miranda* rights, and agreed to speak to agents without an attorney present. CORAL stated he was the driver and registered owner of the vehicle and understood he had been taken into custody because something had been found in the vehicle.

19. CORAL stated that he had taken the vehicle to a car wash in Tijuana, Mexico and probably left it there for approximately 4 hours. CORAL did not know the name of the car wash in Mexico. CORAL denied any knowledge of the narcotics and did not believe his wife was involved with the narcotics. CORAL said they traveled to Tijuana to get his wife glasses. CORAL said he owned the vehicle for approximately one and a half (1 ½) months. He said he bought it off the street from a guy in Los Angeles. CORAL claimed to have bought the vehicle for his wife who didn't like driving larger cars. CORAL said he did not know the name of the seller of the vehicle.

20. CORAL's wife, Susana Coral, also agreed to speak to agents after being read her *Miranda* rights. During her statement, Ms. Coral indicated that her husband had an older model Samsung cell phone that he had with him on the night of his arrest.

21. Based upon my experience and investigation in this case and others, I believe that CORAL, as well as other persons yet unknown, were involved in an on-going conspiracy to import methamphetamine or some other prohibited narcotics and to distribute those prohibited narcotics within the United States. Based on my investigation of drug importation and distribution conspiracies, telephone contact with smugglers can begin months or weeks before drugs are loaded in the car. **Subject Telephone #1** were likely used in furtherance of the importation conspiracy during this period. Given these facts, I respectfully request permission to search **Subject Telephone #1** for data beginning on January 16, 2019, up to and including June 16, 2019.

22. In sum, based on my experience investigating narcotics smugglers, I believe that CORAL may have used **Subject Telephone #1** to coordinate with co-conspirators regarding the importation and delivery of the methamphetamine in the vehicle, and to otherwise further this conspiracy both inside and outside the United States. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites like Facebook, pictures and other digital information are stored in the memory of cellular telephones, which identify other persons involved in narcotics trafficking activities. This type of information would be stored on **Subject Telephone #1**.

## SEARCH METHODOLOGY

23. It is not possible to determine, merely by knowing the cellular telephones make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephone and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars

and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24.  Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25.  Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

26. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that CORAL used **Subject Telephone #1** to facilitate the offense of importation of a controlled substance. **Subject Telephone #1** was likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence of a crime, or property designed or intended for use, or which is or has been used as a means of committing violations of Title 21, United States Code, Sections 952, 960 and 963.

27. Because **Subject Telephone #1** was promptly seized at the time CORAL was arrested and has been securely stored, there is probable cause to believe that evidence of illegal activity committed by CORAL continues to exist on **Subject Telephone #1**. For the reasons detailed above, I believe the appropriate range for the searches is from January 16, 2019 to June 16, 2019.

28. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I know that the items to be seized set forth in Attachment B are likely to be found in the property to be searched described in Attachment A. Therefore, I respectfully request that the Court issue a warrant authorizing me, a Special Agent with HSI, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachment A, and seize the items listed in Attachment B.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Enrique Martinez
Special Agent, HSI

Subscribed and sworn to before me this 12th day of September, 2019.

_____
HON. LINDA LOPEZ
United States Magistrate Judge

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

One silver Samsung cellular telephone, Model SM-J327T1, IMEI: 355417/09/170673/6 seized from Constancio CORAL, pictured below:




The **Subject Telephone #1** is currently in an evidence vault located at 880 Front Street, San Diego, CA 92101.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular phones described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular phone for evidence described below. The seizure and search of the cellular phone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular phone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of January 16, 2019, up to and including June 16, 2019:

   a. tending to indicate efforts to import methamphetamine, or some other federally controlled substance, from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

   d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the **Subject Telephone #1**; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.**